AO 91 (Rev. 11/11)  Criminal Complaint

# SEALED
## BY ORDER OF THE COURT

# UNITED STATES DISTRICT COURT
### for the
### District of Hawaii

> FILED IN THE
> UNITED STATES DISTRICT COURT
> DISTRICT OF HAWAII
> *Jul 26, 2021*
> Michelle Rynne, Clerk of Court

United States of America )
v. )
)  Case No.
Maurice Stroud )      Mag. No. 21-00926 WRP
)
)
)

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___8-18-2020 and 8-27-2020___ in the county of ___Honolulu___ in the ___ District of ___Hawaii___, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) 21 U.S.C. § 841(b)(1)(B) 18 U.S.C. § 2(a) | Count 1:  distribution on August 18, 2020, of five or more grams of methamphetamine, in violation of Title 21, United States Code, Sections 841 (a)(1) and 841(b)(1)(B), and Title 18, United States Code, Section 2(a) |
|  | Count 2:  distribution on August 27, 2020, of five or more grams of methamphetamine, in violation of Title 21, United States Code, Sections 841 (a)(1) and 841(b)(1)(B), and Title 18, United States Code, Section 2(a) |

This criminal complaint is based on these facts:

☑ Continued on the attached sheet.

_____
*Complainant's signature*

CHARLOTTE MIKI, FBI Task Force Officer
*Printed name and title*

Sworn to under oath before me telephonically, and attestation acknowledged pursuant to FRCP 4.1(b)(2)..

Date: ___July 26, 2021___

City and state: ___Honolulu, Hawaii___

_____
Rom A. Trader
United States Magistrate Judge

## AGENT'S AFFIDAVIT
## IN SUPPORT OF CRIMINAL COMPLAINT

I, Charlotte Miki, being duly sworn, depose and state the following:

### INTRODUCTION AND AGENT BACKGROUND

1.     I am a law enforcement officer with the Honolulu Police Department
(HPD) and have been so employed since October of 2008.  I am currently assigned
as a Task Force Officer (TFO) with the Federal Bureau of Investigation (FBI), and
have been since October 2018.  My duties include, but are not limited to,
investigating drug trafficking and organized crime groups.  I am an investigative
law enforcement officer of the United States within the meaning of Section
2510(7) of Title 18, United States Code, and empowered by law to conduct
investigations of and to make arrests for offenses enumerated in Section 2516 of
Title 18, United States Code.

2.     In my capacity as a TFO, I have become versed in the methodology
utilized in criminal enterprises, such as narcotics trafficking operations, and I have
become knowledgeable about the enforcement of state and federal laws pertaining
to violations listed under Title 21, United States Code, Sections 841 and 846,
possession with intent to distribute a controlled substance and conspiracy to
possess with intent to distribute.  I am experienced in evidence collection, physical
surveillance, interviews, and the use of search warrants and informants.

3.     This affidavit is made in support of a Criminal Complaint charging

Maurice STROUD, aka "M.Dot" (hereinafter "STROUD") with (i) distribution on

August 18, 2020, of five or more grams of methamphetamine, in violation of Title

21, United States Code, Sections 841(a)(1) and 841(b)(1)(B), and Title 18, United

States Code, Section 2(a) (Count 1); and (ii) distribution on August 27, 2020, of

five or more grams of methamphetamine, in violation of Title 21, United States

Code, Sections 841(a)(1) and 841(b)(1)(B), and Title 18, United States Code,

Section 2(a) (Count 2).

4.     This affidavit is intended to show only that there is sufficient probable

cause for the charges in the Criminal Complaint and does not set forth all of my

knowledge about this matter.  The facts presented in the probable cause section of

this affidavit are based upon my participation in the investigation, my examination

of reports and records, and my conversations with other law enforcement agents

and other individuals, as well as my training and experience.

## OVERVIEW OF INVESTIGATION

5.     Since at least August 2020, STROUD has been trafficking

methamphetamine and cocaine base, commonly known as "crack," in the Honolulu

Chinatown area.  STROUD's main area of operation is near River Street and North

Hotel Street—an area less than 1,000 feet away from ʻAʻala Park.  At times,

2

STROUD has been observed engaging in drug trafficking activities in this area on an almost daily basis.

6.    Beginning in August 2020, HPD conducted several undercover operations in which undercover officers purchased methamphetamine and crack cocaine either directly from STROUD or from individuals acting under STROUD's direction. As explained more fully below, during these undercover operations, law enforcement observed that at least two individuals—"D.H." and "A.R."—at times have assisted STROUD in his drug trafficking activities.

7.    This investigation has also revealed that STROUD has possessed firearms in several locations where those firearms would be readily available to assist him in his drug trafficking activities: in the immediate area in Chinatown where STROUD has sold drugs, in the vehicle in which he travels to and from the locations of his drug sales, and in the home in which he lives and in which he has at times stored drugs.

## PROBABLE CAUSE

### The Undercover Operation on August 13, 2020

8.    On August 13, 2020, HPD used two undercover officers (hereinafter "UCO #1" and "UCO #2," or collectively the "UCOs") to purchase controlled substances from STROUD in the Honolulu Chinatown area. The UCOs drove over to an area near the intersection of River and North Hotel Streets, where STROUD

3

was known to distribute controlled substances.  UCO #1 then got out of the vehicle that UCO #2 was driving and walked over to meet with STROUD.  UCO #1 used a hidden audio recording device to record the interaction with STROUD.  Meanwhile, a surveillance unit video recorded the interaction from a distance.[1]

9.     While at the intersection of River and North Hotel Streets, UCO #1 engaged with STROUD and eventually paid him $200 in cash.  In return, STROUD provided UCO #1 with ten clear plastic zip type bags containing a white, rock-like substance resembling "crack" cocaine with a total weight of approximately two grams.   Utilizing a handheld spectral analyzer, the rock-like substance proved presumptively positive for the presence of cocaine base.

### The Undercover Operation on August 18, 2020

10.     On August 18, 2020, HPD again directed the UCOs to purchase controlled substances from STROUD.  The UCOs again drove over to the corner of River and North Hotel Streets and UCO #1 got out of the vehicle and met with STROUD.  UCO #1 once again made an audio recording of the interaction.

11.     During this undercover operation, UCO #1 sought to purchase both a quantity of crack cocaine and a "zip"—that is, one ounce or approximately 28 grams—of methamphetamine from STROUD.  This time, STROUD did not

---

[1] The time stamp for the video incorrectly reflects that it was taken on "7-28-2016."  The video was, as described above, taken on August 13, 2020.

4

himself provide these controlled substances to UCO #1. Instead, STROUD

explained that he would have to "go home" to obtain what UCO #1 sought to

purchase because, as STROUD explained, "I don't carry that much on me." UCO

#1 offered to "chill here" and wait, but STROUD instead requested UCO #1's

phone number and explained that he would have someone drop off a "ball" (that is,

an eighth of an ounce or approximately 3.5 grams) of crack cocaine and the "zip"

of methamphetamine in about 45 minutes. STROUD told UCO #1 that he would

give UCO #1 a call.

12.     Approximately an hour and 30 minutes later, STROUD called UCO

#1 and instructed UCO #1 to meet in the parking lot area of the Safeway on

Beretania Street. STROUD then texted UCO #1 that STROUD's girlfriend—

D.H.—would be in a silver car to meet with UCO #1.

13.     The UCOs drove to the Safeway on Beretania Street and parked in

front of the American Savings Bank. D.H. also then drove into the parking lot of

American Savings Bank, where she was observed by surveillance units. UCO #1

walked up to D.H., who was seated in a Ford Fusion bearing Hawaii License Plates

"PPR 803." UCO #1 provided $1,550 in U.S. currency to D.H. In return, UCO #1

received (i) one clear plastic wrapped bag for $350 containing a white powdery

rock like substance resembling crack cocaine weighing approximately one eighth

of an ounce, or approximately 3.5 grams; and (ii) one yellow colored Ziploc bag

for $1,200 containing a crystal-like substance resembling methamphetamine

weighing approximately one ounce or approximately 28 grams. Utilizing a

handheld spectral analyzer, the rock-like substance proved presumptively positive

for the presence of cocaine base and the crystal-like substance proved

presumptively positive for the presence of methamphetamine.

14.     The crystal-like substance, which carried a weight of 1.09 ounces, or

30.9 grams when weighed by HPD the same day, was later submitted to the Drug

Enforcement Administration's laboratory for analysis, which revealed that the

substance was methamphetamine with an approximate purity of 99 percent.

### The Undercover Operation on August 27, 2020

15.     On August 27, 2020, HPD used the same UCOs to purchase

controlled substances from STROUD. This time, the UCOs again sought to

purchase crack cocaine and a "zip" of methamphetamine from STROUD.

16.     Two days before this operation, on August 25, 2020, UCO #1 was

directed to send a text message to STROUD in which UCO #1 asked if UCO #1

could purchase "4 zips" on behalf of UCO #1's purported associate. In response,

STROUD texted, "12 [*i.e.*, $1,200 for an ounce] is a deal but I'm not selling

nobody that many at a time rn [*i.e.* right now] till I'm further notice." STROUD

sent a follow up text in which he clarified, "Only one [zip or ounce] at a time."

UCO #1 then texted that UCO #1's purported associate was "down for take another

one for 12," that is, to purchase another ounce of methamphetamine for $1,200. UCO #1 added that UCO #1 would purchase "my usual 200," meaning $200 of the drug UCO #1 was known to purchase from STROUD, namely, crack cocaine. STROUD agreed to meet in two days.

17.     On August 27, 2020, again acting at the direction of other HPD personnel, UCO #1 texted STROUD and asked, "Wassup man. We still good for today?" STROUD confirmed that he was available and instructed UCO #1 to meet at "Safe way" again. UCO #1 again confirmed by text that UCO #1 sought to purchase "1 zip and my usual 200." UC asked if STROUD would be "in the Ford like last time?" That was a reference to the Ford Fusion that D.H. drove to the drug transaction on August 18, 2020. STROUD responded, "No white vw," an apparent reference to a Volkswagen that STROUD would be using this time.

18.     The UCOs drove to the Safeway on Beretania Street and parked in front of the American Savings Bank. D.H. also then drove into the parking lot of American Savings Bank, where she was observed by surveillance units. This time, she was driving a white Volkswagen vehicle bearing Hawaii State License Plates "WBC 054." Surveillance units observed as D.H. drove into the parking lot next to the American Savings Bank, exited her vehicle and met with UCO #1. UCO #1 paid a total of $1400.00 to D.H. In return, UCO #1 received (i) one clear plastic bag containing a white powdery-like substance for $200.00 weighing three grams;

7

and (ii) and one yellow in color plastic zip type bag containing a crystal-like substance for $1200.00 weighing one ounce.  Utilizing a handheld spectral analyzer, the rock-like substance proved presumptively positive for the presence of cocaine base and the crystal-like substance proved presumptively positive for the presence of methamphetamine.

19.     The crystal-like substance, which carried a weight of 1.06 ounces, or 30.05 grams when weighed by HPD the same day, was later submitted to the Drug Enforcement Administration's laboratory for analysis, which revealed that the substance was methamphetamine with an approximate purity of 99 percent.

## **Additional Undercover Operations**

20.     Two recent undercover operations demonstrate that STROUD has continued to engage in drug trafficking activities and has continued to direct others to effectuate drug transactions on his behalf.

21.     On July 6, 2021, HPD utilized UCO #2 to make contact with STROUD using the same phone number that STROUD had used during the prior undercover operations in August 2020.

22.     UCO #2 texted STROUD pretending to be UCO #1 (because all contacts with STROUD up to this point had been solely UCO #1).  Upon making contact with STROUD, STROUD did not remember who UCO #1 was, but rather texted, "if you know where I be pull up[.]" This was a reference to stop by

8

STROUD's usual location (River Street and North Hotel Street), where UCO #2 could purchase controlled substances.

23.     UCO #2 proceeded to the River and North Hotel Street corner where STROUD was known to conduct his illegal drug trafficking activity. Upon arrival, UCO #2 did not observe STROUD to be at that location, so the operation was cancelled.

24.     UCO #2 was finally able to make contact with STROUD on July 13, 2021. UCO #2 indicated that they would go to STROUD's usual location at River and North Hotel Street and asked if he was there. STROUD answered "Yup[.]" UCO #2 proceeded to the River and North Hotel Street corner, but upon arrival, did not observe STROUD to be at that location, however, UCO #2 did observe A.R., a known associate of STROUD to be there. UCO #2 contacted STROUD and informed him that he was not seen at his usual location. STROUD responded "Bro it's there if you see me or not."

25.     UCO #2 approached A.R. and informed her that "I came to pick up for my girl." This was a reference by UCO #2 that he was there representing UCO #1. A.R. asked UCO #2, "what is her name?" In response, UCO #2 stated "Cherise" as this was the name previously given to STROUD by UCO #1. A.R. stated, "you said the right name." UCO #2 then purchased ten clear plastic zip baggies containing a white rock-like substance resembling crack-cocaine as well as

five clear zip baggies containing a crystal like substance resembling methamphetamine from A.R. for a total of $300.

26.     On July 13, 2021, UCO #2, again pretending to be UCO #1, contacted STROUD thanking him for the purchase made earlier on this day and stated that my boy still is interested in purchasing the "zip." "ZIP" referring to an ounce of methamphetamine. STROUD replied that he had the "zip" with him right now for $900. UCO #2 informed STROUD to hold on to the "zip" until tomorrow.

27.     On July 14, 2021, UCO #2, pretending to be UCO #1, contacted STROUD and indicated headed over to pick up the "zip" at his location, in which he responded, "ok it's go be there for you." This is a reference to stop by STROUD's usual location (River Street and North Hotel Street).

28.     UCO #2 again proceeded to River Street and, once there, approached A.R., asking her for the "zip" of meth. UCO #2 observed A.R. to make a phone call to someone, presumably STROUD, asking if it was okay to sell the "zip" to UCO #2. A.R. was then observed by UCO #2, as well as surveillance units in the area, to drop an item into a cardboard box near her location. UCO #2 then recovered the item, which was in fact the "zip" of methamphetamine, and left $900 in U.S. currency in the same cardboard box.

//

//

10

## STROUD's Instagram Account

29.     Through a federal search warrant, law enforcement has obtained

information from an Instagram account under the account identifier "Mrsteppa_,"

which is believed to be an Instagram account under STROUD's control.  Evidence

from this account provides additional probable cause that STROUD has engaged in

drug trafficking activities as charged in the Criminal Complaint.  Evidence from

this account also indicates that STROUD has been in possession of firearms and

has sought out firearms for purchase.  From my training and experience, I know

that drug traffickers sometimes possess firearms in order to protect themselves and

their contraband.

30.     On July 31, 2020, the "Mrsteppa_" account shared six distinct

"stories" which included videos showing, among other things, firearms (including

an AR-style long gun and a pistol), scales, and substances appearing to be crack

cocaine and methamphetamine.  In these videos, a voice narrates that I recognize to

belong to STROUD.  In addition, in some of the videos, STROUD's face is visible.

Moreover, the videos appear to have been made in STROUD's apartment on

Wilder Avenue, Honolulu, Hawaii.  I believe the apartment seen in the video is

STROUD's apartment based on information obtained during surveillance of that

area and observations made of that apartment.

11

31.     The "Mrsteppa_" account also was used to solicit additional firearms.

On July 24, 2020, the "Mrsteppa_" account engaged in the following direct

message, text-type conversation with another account regarding the purchase of

ammunition magazines for a Glock 26 handgun:

mrsteppa_: Aye cousin can you send clips

foreignn_h: Yea for what kind

mrsteppa_: 26

foreignn_h: I got a 33rd for 100

foreign_h:   I had some 9 drums 2 but just sold em [unknown emoji]

mrsteppa_: I'll buy it

mrsteppa_: Fuck [unknown emoji]

foreignn_h: It's good

foreign_h:   I'll give you 400 for everything

foreignn_h: I would have to get another drum that my patnah shit, but I got

you with the stick when I go back I'll get you a drum

mrsteppa_: Ok I'll send you the money tomorrow or today. Cashapp or
Walmart

foreign_h:   Cashapp smooth so we don't gotta deal with goin to store n I
can send it out in the morning

mrsteppa_: Ok

...

12

32.     Through my training and experience, I know that a "drum" type magazine has the capacity to hold anywhere between fifty and one hundred rounds of ammunition.  Additionally, in the conversation, the account corresponding with "Mrsteppa_" indicates that the user has a 33 round magazine for $100 and several 9mm "drum" magazines that "Mrsteppa_" indicates he wished to buy for $400.

## Other Evidence of STROUD's Firearm Possession

33.     HPD reports show that STROUD has possessed one or more firearms while in his vehicle—and, indeed, has even used those firearms to threaten individuals.  HPD reports further show that STROUD has used threats of violence directly to further his drug trafficking activities, and that he has also kept a firearm in the Chinatown area in which he engaged in his drug trafficking activity.

34.     Most recently, on June 29, 2021, HPD received a complaint of a traffic incident regarding a male brandishing a handgun on the roadways:

a.      The complaint was made by a male individual ("Victim-1") and female individual ("Victim-2").  Victim-2 stated that she and Victim-1 were driving on the H1 Freeway when a blue Volkswagen began to drive aggressively near them as a result of one of the cars possibly cutting the other off.  Victim-2 and Victim-1 both noted the Volkswagen's license plate, TXA 234, which is a vehicle known to be associated with STROUD and registered to his girlfriend, D.H., with the same address on Wilder Avenue where STROUD resides.  Victim-2 said the

Volkswagen drove up next to them with an individual, later identified by Victim-2 as STROUD, sticking his middle finger at the both of them and yelling, "I'm gonna pop your head," and "you cut us off, bro." Victim-2 also stated that Victim-1 told her, during the incident, that STROUD had a gun, although Victim-2 did not personally see a weapon herself. On July 1, 2021, Victim-2 was shown a sequential line up photo and identified STROUD as the passenger of the blue Volkswagen who was yelling at them on June 29, 2021.

        b.    Victim-1 stated STROUD stuck his head out of the window of the blue Volkswagen and was looking and yelling at them. Victim-1 stated that STROUD pulled a handgun and pointed it directly at him twice as they were driving down on Punahou Street and Beretania Street. Victim-1 said STROUD yelled at him saying "I'm going pop you in the head." Victim-1 related that the gun was black in color and attached was a light. Victim-1 knew that this was not an airsoft type gun as he was able to look into the barrel of the gun and it was big enough that a bullet could have come out of it. On July 1, 2021, Victim-1 was shown a sequential line up and identified both STROUD as the passenger and A.R. as the driver of the blue Volkswagen.

        c.    HPD followed up by reviewing the registered owner of the blue Volkswagen, and made a check of the area around STROUD's known residence but could not locate the vehicle at that time. This incident was documented

14

initially under HPD report number 21-278403 as well as a subsequent FBI FD-302 documenting the sequential lineup identification.

35.    On January 22, 2021, HPD received a Terroristic Threatening in the Second Degree complaint by another individual ("Victim-3"):

a.    Victim-3 related that while she was driving on Kamehameha Highway north bound just after the Ka Uka Boulevard, a white Volkswagen bearing Hawaii State License plates "WBC 054" had cut her off as the lanes were merging causing her to swerve into the oncoming lane on Kamehameha Highway. Victim-3 stated that both a female driver and male passenger, whom Victim-3 later identified as STROUD, yelled at her. Victim-3 said she eventually came to a stop in Mililani where the white Volkswagen stopped as well and STROUD and a local-looking female exited the vehicle and began to yell at her.

b.    Victim-3 then stated that STROUD threatened to blast her head off with his gun, as he kept reaching for his waist area as if he was going to pull something out. Victim-3 said she immediately drove away when she saw this. Victim-3 later stated that she was very distraught by this incident that she had to seek counseling and was afraid to drive for three months. Victim-3 identified STROUD through a sequential line up photo conducted on July 1, 2021. This incident was documented under HPD report number 21-031984 as well as a subsequent FBI FD-302 documenting the sequential lineup identification.

36.     On December 27, 2020, a victim ("Victim-4") contacted police to inform that he/she was the relative of A.R. and that he/she had been threatened by an associate of A.R.:

a.     Victim-4 believed that the person who threatened him/her was STROUD. A.R. is the known business partner of STROUD. A.R. is a relative of Victim-4 and Victim-4 believes that A.R. has been involved in drug dealing. Victim-4 has observed STROUD to come to his/her home and in December 2020, told A.R. that he/she did not want STROUD coming around. Thereafter, Victim-4 received a phone call from STROUD who told him/her to stay out of his business and that he/she should "watch out you faggot, I will fucking kill you, I will smoke you motherfucker." This report is documented under HPD report number 20-705511.

37.     On September 18, 2020, HPD Officers observed STROUD congregating on River Street and Hotel Street with three other individuals:

a.     In the area on the ground was a money box containing currency. Through my training and experience, I know that drug dealers try to avoid a "hand to hand" transaction and have the customer place currency in a container and retrieve their purchased item from another place in the area or from another person. STROUD, who was near a black Nissan Altima bearing Hawaii State License plates "NZY 465," started to walk away while he was about to receive a citation

16

for violating Emergency Rules and Order related to the COVID-19 pandemic by an HPD Officer. On numerous occasions, STROUD has been seen by HPD Officers driving this black Nissan Altima bearing Hawaii State License plates "NZY 465." This vehicle is registered to STROUD's known business partner A.R.

        b.      The HPD Officer noticed a pink colored cloth zipper bag on the roof of the Nissan "NZY 465" as STROUD walked away. HPD Officer asked if this cloth zipper bag belonged to anyone, in which no one, including STROUD, claimed ownership of. HPD Officer recovered this bag as found property.

        c.      As the HPD Officer held this bag, he felt what appeared to be a barrel and trigger guard of a firearm. Once this bag was opened, HPD Officer observed a black colored Taurus G2C semi-automatic pistol with a loaded magazine inserted in the magazine well. Two medium sized zip lock style transparent plastic bags containing multiple small zip lock style baggies were also observed in this cloth bag. One of the plastic bags contained 132 small zip lock style bags with white crystalline substance resembling crystal methamphetamine. The second plastic bag contained 73 small zip lock style bag with white rock substance resembling crack. Through my training and experience, I believe the baggies were packaged ready for street level distribution.

        d.      The Taurus G2C was found to have been a stolen weapon in a separate 2018 burglary out of the home of a US Service Member in the Wahiawa

17

area. This report and evidence is documented under HPD report number 20-535912.

38.     On April 16, 2018, fronting the Maunakea Liquor store located at 1161 Maunakea Street, officers responded to a weapons complaint in the Chinatown area:

    a.     The victim told police that a male wearing a white shirt pointed a black pistol at him. When police arrived at the area, they observed four males standing in front of the liquor store. Police asked all of the males to place their hands on the wall so they could be identified but two of the males ran from officers. In particular, one male wearing a white t-shirt was observed to be wearing a backpack, took the backpack off and dropped it to the ground before running. Officers searching the backpack recovered a .45 caliber Springfield Armory handgun.

    b.     The male in the white shirt who ran was caught and denied the backpack or weapon was his despite the fact that officers observed him to take the backpack off, place it on the ground and run away from it. The male gave the name of "JAMES LAWSON," but photographs taken of LAWSON clearly show that the individual was in fact STROUD. Furthermore, the police report photographs of STROUD clearly show a chain with the name "M.DOT" hanging from his neck. I know from my investigation into STROUD that this is his "street

name" or "moniker." Additionally, STROUD/LAWSON was visually identified by the victim as the male who threatened him by pointing a gun at him.

      c.    The victim declined to prosecute in this case. This case is documented under HPD report number 18-144552.

## **CONCLUSION OF THE AFFIANT**

39.    Based on my training and experience and the aforementioned facts, I believe that probable cause exists that STROUD committed the crimes of (i) distribution on August 18, 2020, of five or more grams of methamphetamine, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B), and Title 18, United States Code, Section 2(a) (Count 1); and (ii) distribution on August 27, 2020, of five or more grams of methamphetamine, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B), and Title 18, United States Code, Section 2(a) (Count 2).

Respectfully submitted,

CHARLOTTE MIKI
Task Force Officer
Federal Bureau of Investigation

This Criminal Complaint and Affidavit in support thereof were presented to, approved by, and probable cause to believe that the defendant above-named committed the charged crime found to exist by the undersigned Judicial Officer at __12:10__ p.m. on July 26, 2021.

19

Sworn to under oath before me telephonically, and attestation acknowledged pursuant to Federal Rule of Criminal Procedure 4.1(b)(2), on July 26, 2021, at Honolulu, Hawaii.



Rom A. Trader
United States Magistrate Judge